Case Nos. 24-1538, 24-1826

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

JACKI EASLICK LLC, JE CORPORATE LLC,
*Plaintiffs-Appellants,*

v.

ACCENCYC US,
*Defendant-Appellee,*

CJ EMERALD, ET AL.,
*Defendants.*

Appeal from the United States District Court for
the Western District of Pennsylvania
Case No. 23-cv-2000-WSS—Judge William S. Stickman IV

BRIEF OF LAW PROFESSORS SARAH FACKRELL, ERIC GOLDMAN,
ELIZABETH ROSENBLATT, AND SAURABH VISHNUBHAKAT AS
*AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE AND
AFFIRMANCE

Phillip R. Malone
Nina K. Srejovic
JUELSGAARD INTELLECTUAL PROPERTY
    AND INNOVATION CLINIC
MILLS LEGAL CLINIC AT
    STANFORD LAW SCHOOL
559 Nathan Abbott Way
Stanford, CA 94305
(650) 725-6369
pmalone@stanford.edu

*Counsel for Amici Curiae*

<u>**CERTIFICATE OF INTEREST**</u>

Pursuant to Federal Circuit Rules 29(a) and 47.4, counsel for *amici curiae* intellectual property law professors certifies that:

1.      The full names of the *amici curiae* I represent are: *amici curiae* intellectual property law professors Sarah Fackrell, Eric Goldman, Elizabeth Rosenblatt, and Saurabh Vishnubhakat.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) I represent is: N/A.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the *amici curiae* I represent are: None.

4.      The names of all law firms and the partners or associates that appeared before the originating court for the *amici curiae* I represent or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are: None.

5.      The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal: None.

6. All information required by Federal Rules of Appellate Procedure 26.1(b) and 26.1(c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases is: None.


February 6, 2025                    /s/ Phillip R. Malone

                                   Phillip R. Malone
                                   Nina K. Srejovic
                                   JUELSGAARD INTELLECTUAL PROPERTY
                                      AND INNOVATION CLINIC
                                   MILLS LEGAL CLINIC AT STANFORD
                                      LAW SCHOOL
                                   559 Nathan Abbott Way
                                   Stanford, CA 94305
                                   (650) 725-6369
                                   pmalone@stanford.edu

                                   *Counsel for Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF AUTHORITIES................................................................. iii

INTEREST OF *AMICI CURIAE*..........................................................1

SUMMARY OF ARGUMENT................................................................2

ARGUMENT .....................................................................................3

    I.    The District Court Properly Denied Appellants' Request for a Preliminary Injunction. ............................................................. 3

        A.    Appellants Did Not Meet Their Burden of Proving Likelihood of Infringement.......................................................................... 4

        B.    Irreparable Harm Must Be Specific to Each Defendant's Conduct, Not the Aggregate of All Defendants' Conduct. ........................................ 7

    II.    Appellants' Request for a Preliminary Injunction Fails Because It Is Built Upon a Defective Claim Typical of Schedule A Cases. ......................... 10

        A.    This Case is an Example of the Legally Flawed and Abusive Schedule A Litigation Model. .......................................................... 10

        B.    Appellants' Inability to Make the Necessary Showings for a Preliminary Injunction Is the Predictable Consequence of Their Failure to Plead Sufficiently. ............................................................. 14

        C.    Patent Cases Are Particularly Ill-Suited for Schedule A Litigation. . 16

CONCLUSION .....................................................................................20

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*ABC Corp. I v. P'ship & Unincorporated Ass'ns Identified on Schedule "A",*
51 F.4th 1365 (Fed. Cir. 2022) .................................................................... 4, 12

*ABC Corp. I v. P'ship & Unincorporated Ass'ns Identified on Schedule "A",*
52 F.4th 934 (Fed. Cir. 2022) ............................................................................ 15

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.,*
239 F.3d 1343 (Fed. Cir. 2001) .......................................................................... 18

*Apple Inc. v. Samsung Elecs. Co.,*
678 F.3d 1314 (Fed. Cir. 2012) ............................................................................ 8

*Apple Inc. v. Samsung Elecs. Co.,*
695 F.3d 1370 (Fed. Cir. 2012) ............................................................................ 8

*Apple Inc. v. Samsung Elecs. Co.,*
809 F.3d 633 (Fed. Cir. 2015) .............................................................................. 8

*Atari Interactive, Inc. v. Individuals, Corps., Ltd. Liab. Cos., P'ships, & Unincorporated Ass'ns Identified on Schedule A to the Complaint,*
No. 1:23-cv-15724 (N.D. Ill. Dec. 1, 2023), ECF No. 21 ................................. 16

*Betty's Best, Inc. v. Individuals, P'ships & Unincorporated Ass'ns Identified on Schedule "A",*
No. 1:23-CV-22322-KMW, 2023 WL 8310347 (S.D. Fla. Nov. 17, 2023) ........................................................................................................................ 10

*Bot M8 LLC v. Sony Corp. of Am.,*
4 F.4th 1342 (Fed. Cir. 2021) .............................................................................. 14

*Egyptian Goddess, Inc. v. Swisa, Inc.,*
543 F.3d 665 (Fed. Cir. 2008) (en banc) ................................................. 4, 5, 6, 18

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
   796 F.3d 1312 (Fed. Cir. 2015) ............................................................4, 5, 6, 7

*Gorham Mfg. Co. v. White*,
   81 U.S. 511 (1871) ....................................................................................4

*Int'l Seaway Trading Corp. v. Walgreens Corp.*,
   589 F.3d 1233 (Fed. Cir. 2009) ................................................................7

*LKQ Corp. v. GM Glob. Tech. Operations LLC*,
   102 F.4th 1280 (Fed. Cir. 2024) (en banc)..........................................6, 7

*The Pinkfong Co. Inc. v. 7 Day Store*,
   No. 1:22-cv-04133(S.D.N.Y. 2023), ECF No. 8 ................................12

*Reilly v. City of Harrisburg*,
   858 F.3d 173 (3d Cir. 2017), *as amended* (June 26, 2017) ..................4

*Thousand Oaks Barrel Co., LLC, v. P'ships & Unincorporated Ass'ns
   Identified on Schedule A*,
   No. 1:23-cv-03378 (N.D. Ill. 2023), ECF No. 45 ...........................16

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ......................................................................................3

*Zaful (Hong Kong) Ltd., v. Individuals, Corps., Ltd. Liab. Cos.,
   P'ships, & Unincorporated Ass'ns Identified on Schedule A*,
   No. 1:24-cv-11111, 2025 WL 71797 (N.D. Ill. Jan. 10, 2025) .........18

*Zhaoshi Tang v. P'ships & Unincorporated Ass'ns Identified on
   Schedule A*,
   No. 1:23-cv-04587 (N.D. Ill. Jan. 4, 2024), ECF No. 88 .................19

**Statutes**

35 U.S.C. § 299 ........................................................................................17

35 U.S.C. § 299(a)(1) .........................................................................13, 18

35 U.S.C. § 299(b)...................................................................................19

## Other Authorities

Eric Goldman, *A SAD Scheme of Abusive Intellectual Property Litigatio*n, 123 COLUM. L. REV. F. 183 (2023) ............................................*passim*

Eric Goldman, *SAD Scheme Leads to Another Massively Disproportionate Asset Freeze–Powell v. Schedule A*, TECH. & MKTG. L. BLOG (Jul. 19, 2024) .........................................................10

Fed. R. App. P. 29(a)(2) ....................................................................1

Fed. R. Civ. P. 8 ........................................................................14, 15

Marko R. Zoretic and Jack Hendershott, *"Schedule A" Cases: A Powerful Tool for Enforcing Design Patents*, N.Y.L.J. (May 15, 2023)................................................................................................11

Riddhi Setty & Isaiah Poritz, *Brands Flock to Chicago Court in War on Internet Counterfeiters*, BLOOMBERG L. (Apr. 5, 2023)................................17

Sarah Burstein, *Against the Design-Seizure Bill*, PATENTLY-O (Jan. 3, 2020)................................................................................................18

Sarah Burstein, *Intelligent Design & Egyptian Goddess: A Response to Professors Buccafusco, Lemley & Masur*, 68 DUKE L.J. ONLINE 94 (2019) ..............................................................................................5

Sarah Burstein, *Is Design Patent Examination Too Lax?*, 33 BERKELEY TECH. L.J. 607 (2018) ........................................................6

Sarah Fackrell, *The Counterfeit Sham*, 138 HARV. L. REV. 471 (2024).............1, 19

*Schedule A Cases Continue to Rise in the Northern District of Illinois*, LEX MACHINA (Jul. 24, 2024) .........................................................17

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are professors Sarah Fackrell (who previously published under the name Sarah Burstein), Chicago-Kent College of Law; Eric Goldman, Santa Clara University School of Law; Elizabeth Rosenblatt, Case Western Reserve University Law School; and Saurabh Vishnubhakat, Cardozo School of Law.[1] They are professors of intellectual property law who regularly write and teach about design patents, utility patents, and intellectual property generally. *Amici* have also studied and written about the phenomenon of so-called "Schedule A" mass-defendant intellectual property litigation like that pursued in this case.[2] *Amici* have no personal or financial interest in the outcome of this case. Rather, *amici* write from their broader perspectives on the abusive and legally flawed nature of Schedule A litigation, particularly in patent cases.[3]

---

[1] No party or party's counsel authored any part of this brief or contributed money towards its preparation or submission. No one, other than *amici* and their counsel, contributed money towards the preparation or submission of this brief. Pursuant to Fed. R. App. P. 29(a)(2), counsel for Appellee has consented to the filing of this brief; counsel for Appellant has advised that they are unable to state a position. *Amici* submit this brief pursuant to the Court's February 28, 2025 order granting leave to file.

[2] *See, e.g.*, Sarah Fackrell, *The Counterfeit Sham*, 138 HARV. L. REV. 471 (2024); Eric Goldman, *A SAD Scheme of Abusive Intellectual Property Litigation*, 123 COLUM. L. REV. F. 183 (2023).

[3] *Amici* wish to thank Stanford Law School Juelsgaard Intellectual Property and Innovation Clinic Certified Law Students August Gebhard-Koenigstein and Yiran (Isabella) Yang for their substantial assistance in drafting this brief.

# SUMMARY OF ARGUMENT

This case is a typical "Schedule A" case, where a plaintiff joins together a large number of unrelated online merchants in a single infringement complaint—in violation of the special joinder requirements under the Patent Act—naming them in an attached "Schedule A" that is filed under seal (as is sometimes the entire complaint). Appellant here joined 67 defendants, who were selling at least four different kinds of products, in one complaint that consisted primarily of generic, vague, and non-particularized allegations of infringement and harm.

Like typical Schedule A plaintiffs, Appellants then sought and obtained on the basis of those flawed allegations an ex parte temporary restraining order ("TRO") before Appellee had notice or could contest Appellants' allegations. That injunction, also under seal, froze Appellee's online marketplace account and $40,000 in it despite Appellee making only $500 in allegedly infringing sales. Only when Appellee had an opportunity to rebut Appellants' submissions, and the district court engaged in a particularized examination of infringement specific to Appellee at the preliminary injunction stage, did the court properly conclude that Appellants had failed to meet their burden of showing they are likely to succeed on the merits and suffer irreparable harm. That ruling is correct and should be affirmed, but the path to it demonstrates the legal and procedural deficiencies in Appellants' case and in Schedule A litigation generally.

The litigation abuses in this case are typical of those in the mass-defendant Schedule A litigation model. Schedule A cases require judges to analyze extensive but vague allegations of infringement on an ex parte basis, and to do so quickly and at scale. Patent cases like this one are particularly ill-suited to the Schedule A model. Appellants' generic, vague, and non-particularized allegations of infringement and harm, common in Schedule A patent cases, illustrate the defects inherent in such cases. These defects are especially harmful when courts are asked to issue mass orders shutting down storefronts and freezing often-unrelated assets without having sufficient time and information to accurately assess the facts particular to each defendant.

Schedule A cases are rarely appealed because the model, and in particular the asset freeze, puts defendants at such an extreme disadvantage: most defendants will be forced to settle quickly, be voluntarily dismissed, or will default—even when the claims against them are not legally or procedurally sound. Thus, this case presents a rare opportunity for this Court, in the course of evaluating the litigation and decision below, to address the abuses of the Schedule A litigation model in patent cases.

## ARGUMENT

**I. The District Court Properly Denied Appellants' Request for a Preliminary Injunction.**

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Under Third

Circuit law, which applies in this case,[4] two factors—likelihood of success on the merits and likelihood of irreparable harm in the absence of preliminary relief—are treated as "gateway factors" for obtaining a preliminary injunction. *E.g.*, *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017). The district court here correctly denied Appellants' request for a preliminary injunction because Appellants failed to show either a likelihood of success on the merits or irreparable harm.

## A. Appellants Did Not Meet Their Burden of Proving Likelihood of Infringement.

The district court properly concluded that Appellants failed to demonstrate they are likely to succeed on the merits. Appellants cannot show that Appellee's accused product looks so similar to Appellants' claimed product that "an ordinary observer, giving such attention as a purchaser usually gives" would "purchase one supposing it to be the other." *Gorham Mfg. Co. v. White*, 81 U.S. 511, 528 (1871). In *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008) (en banc), this Court, sitting en banc, set forth a two-step framework for analyzing design patent infringement. *Egyptian Goddess*, 543 F.3d at 678; *see also*, *Ethicon Endo-*

---

[4] "[W]e review a grant or denial of a preliminary injunction using the law of the regional circuit." *ABC Corp. I v. P'ship & Unincorporated Ass'ns Identified on Schedule "A"*, 51 F.4th 1365, 1375 (Fed. Cir. 2022) (citation omitted).

*Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1335 (Fed. Cir. 2015). Appellants fail at both steps, though failing only at the first would be sufficient for a finding of non-infringement. *See Ethicon*, 796 F.3d at 1335.

First, there is no infringement if an ordinary observer comparing the claimed design and the accused design in a vacuum (without any reference to the prior art) would consider the designs "plainly dissimilar." *Egyptian Goddess*, 543 F.3d at 678. This step can be thought of as setting forth the "presumptive scope" of a design patent. Sarah Burstein, *Intelligent Design & Egyptian Goddess: A Response to Professors Buccafusco, Lemley & Masur*, 68 DUKE L.J. ONLINE 94, 117 (2019). Here, the ordinary observer looking at Appellants' claimed design and Appellee's product would immediately see differences between the shape of the bottom hook (U-shaped vs. semicircular); the portion joining the hooks (spiral vs. smooth); the finishing ends (spherical vs. tubed); and the curvature of the tip of the top hook. Appx12-16. Given these instantly apparent dissimilar visual features between the two designs, an ordinary observer would find the designs plainly dissimilar without even needing to "compare the claimed and accused designs with the prior art." *Ethicon*, 796 F.3d at 1337.

Appellants' infringement claim would also fail under the second step of the *Egyptian Goddess* framework, even if the designs were found not to be plainly dissimilar. At step two, only where "resolution of the infringement inquiry [is not]

already clear" can courts compare the claimed and accused designs with the prior art. *Id.* at 1337. This Court has stated that the purpose of considering the prior art in cases "[w]here the claimed and accused designs are not plainly dissimilar" is "to identify differences that are not noticeable in the abstract." *Id.* at 1335. "The use of the prior art in the design patent infringement analysis is a one-way ratchet—it can be used to narrow the presumptive scope of a claim but cannot be used to broaden it." Sarah Burstein, *Is Design Patent Examination Too Lax*?, 33 BERKELEY TECH. L.J. 607, 612 (2018).

Appellants highlight the difference between their design and the prior art in an attempt to improperly broaden the scope of their claim. Appellants point to the 90-degree twist, implying that their patent is entitled to a broader scope because the claimed design is "easily and immediately distinguishable from the prior art." Appellants' Br. at 21. However, applied correctly, *Egyptian Goddess* requires a visual comparison, in the context of the prior art, to highlight differences between the *claimed* and the *accused* designs. *Egyptian Goddess*, 543 F.3d at 678. Here, the prior art further highlights the dissimilarity between the claimed and accused designs, as the prior art contains the tubular tip and semicircular shape of the accused hook. Appx31-32.

Moreover, as this Court's recent en banc ruling in *LKQ v. GM* demonstrates, the requisite level of visual similarity for infringement is high. *See LKQ Corp. v.*

*GM Glob. Tech. Operations LLC*, 102 F.4th 1280, 1290 (Fed. Cir. 2024) (en banc). In *LKQ*, this Court found non-anticipation (using the same high standard it would have used for an infringement claim)[5] based on subtle differences in the arch curvature and terminus. *Id.* at 1289-90. Here, the differences in curvature and the tip shape between the accused and claimed designs are far more pronounced than in *LKQ*. *Id.* at 1288-89; Appx631. The designs here are not substantially similar.

Design patents protect shapes, not concepts. *See*, *e.g.*, *Ethicon*, 796 F.3d at 1332. Appellants here appear to think that they have ownership over the *concept* of any double-sided hook with a 90-degree twist. *See* Appellants' Br. at 10 ("Easlick's design differed from the prior art in that the hook for the purse was rotated 90 degrees from the hook for the closet rod."). Far from seeking to stem the "tide of cheap infringements crushing their business," Appellants' claim appears to be an attempt to monopolize the concept of offset hooks and stifle lawful competition. *Id.* at 1.

## B. Irreparable Harm Must Be Specific to Each Defendant's Conduct, Not the Aggregate of All Defendants' Conduct.

Demonstrating irreparable harm requires not only showing that there is some causal relationship between the asserted injury and the alleged infringing conduct, but also that "the harm resulting from selling the accused product can be ascribed to

---

[5] "[T]he same test must be used for both infringement and anticipation." *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1239 (Fed. Cir. 2009).

the infringement." *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1375 (Fed. Cir. 2012).[6] "The causal nexus requirement ensures that an injunction is only entered against *a* defendant on account of a harm resulting from *the* defendant's wrongful conduct, *not some other reason*." *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 640 (Fed. Cir. 2015) (emphasis added). Here, Appellants allege harm resulting from the generic, aggregate conduct of all 67 defendants listed in Schedule A rather than from any conduct of Appellee specifically.

As is typical in Schedule A cases, Appellants have made no attempt to particularize the source of their alleged harm to the actions of any one defendant. For example:

- "Plaintiffs have suffered and will suffer irreparable injury as a result of [all 67] Defendants' continued sale of infringing products." Appx65 ¶49;
- "[All 67] Defendants' actions have caused … irreparable harm to Plaintiffs' goodwill and reputation . . . ." Appx90 ¶27;
- "[All 67] defendants' mere presence on an online marketplace irreparably harms Plaintiffs . . . ." Appx638 ¶34.

In generalizing the harms alleged to have been caused by the aggregated group of

---

[6] Separately, because irreparable harm requires a showing of likelihood of infringement, *Apple Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012) ("To show irreparable harm, it is necessary to show that the infringement caused harm in the first place."), and the district court concluded that Appellants failed to show such a likelihood, there necessarily was no irreparable harm.

all 67 defendants, Appellants ignore the fact that their allegations relate to at least four different kinds of products allegedly sold on different platforms and likely advertised in different ways. Appx220-22 (expert declaration dividing defendants' products into four "type[s]"); Appx55 (alleging defendants operate on various online marketplaces such as Amazon and eBay). Their generic claims that "[all 67] defendants' sales of the accused products were causing irreparable harm to the Jacki Easlick Companies' goodwill and reputation . . . brand, consumer confusion, false association, and loss of ability to attract investors and markets . . . ," Appellants' Br. at 11, cannot meet the causal nexus requirement to establish irreparable harm resulting from *Appellee's* alleged infringement.

In contrast to Appellants' generalized harms, Appellee can specifically demonstrate that it suffered significant and disproportionate harm from the TRO and would suffer additional harm if a preliminary injunction was granted. The balance of the equities tips strongly in Appellee's favor. On the same day Appellants filed their lawsuit, they also were granted an ex parte TRO—on the same irreparable harm assertions they relied on in their unsuccessful request for a preliminary injunction. Appx653-55. The TRO ordered "all funds" restrained. Appx559. The TRO, based on generic, non-specific allegations, was highly disproportionate. It ordered Appellee's merchant account frozen along with $40,000 in assets in it—a freeze that lasted for almost two months—even though Appellee generated only $500 in

revenue from the allegedly infringing product. Appx598-99; Appellee's Br. at 8. Appellee was unable to use the wrongly frozen funds to run its business and pay its employees. *See* Appx599. Other defendants in this case also suffered similar harm as a result of disproportionate asset freezes.[7] *See*, *e.g.*, Appx587-90 (showing a group of defendants had $1 million frozen despite only having made $653.12 worth of total sales). Meanwhile, Appellants only deposited a single $5,000 surety bond for their claims against all 67 defendants. Appx655.

## II. Appellants' Request for a Preliminary Injunction Fails Because It Is Built Upon a Defective Claim Typical of Schedule A Cases.

### A. This Case is an Example of the Legally Flawed and Abusive Schedule A Litigation Model.

This case is just one of thousands of intellectual property infringement suits over roughly the past decade brought by plaintiffs who join dozens—sometimes hundreds—of defendants, who often have no relationship with each other, in a single complaint. *See* Eric Goldman, *A SAD Scheme of Abusive Intellectual Property Lit),* 123 Colum. L. Rev. F. 183, 196-198 (2023) [hereinafter Goldman, *SAD*

---

[7] Overbroad and disproportionate asset freezes are routinely granted in Schedule A cases like this one. *See*, *e.g.*, Eric Goldman, *SAD Scheme Leads to Another Massively Disproportionate Asset Freeze–Powell v. Schedule A*, Tech. & Mktg. L. Blog (Jul. 19, 2024), https://blog.ericgoldman.org/archives/2024/07/sad-scheme-leads-to-another-massively-disproportionate-asset-freeze-powell-v-schedule-a.htm; *see also*, *e.g.*, *Betty's Best, Inc. v. Individuals, P'ships & Unincorporated Ass'ns Identified on Schedule "A"*, No. 1:23-CV-22322-KMW, 2023 WL 8310347, at *1 (S.D. Fla. Nov. 17, 2023).

*Scheme*]. The numbers are staggering: estimates suggest over 2000 Schedule A cases were filed in just the years 2020-2022, sweeping in as many as several hundred thousand defendants. *Id.* at 196. Typically, the complaint lists the defendants on a separate document, commonly labeled "Schedule A," that is filed under seal. *Id.* at 184. In this case, 67 defendants were joined and listed on Schedule A, and it was filed under seal. Appx73; Appx655.

Schedule A plaintiffs then typically request an ex parte TRO, also under seal, on the basis of their generic (and often cookie-cutter) complaint and declarations. *See* Goldman, *SAD Scheme* at 197-98. Those requests are almost always granted,[8] as the request in this case was, as a matter of course by district courts with little or no examination of the sufficiency of the allegations, the merits of the infringement claims, or the nexus between any individual defendant's conduct and the alleged harm. These injunctions result in a freeze of the allegedly infringing merchants' accounts and assets on online marketplaces. *See Id.* at 197. In many Schedule A cases, the first time a defendant learns that they have been sued and a TRO has been

---

[8] For example, between January, 2022 and May, 2023, TROs were granted in 85 of 87 Schedule A cases filed in the Northern District of Illinois and all 5 Schedule A cases filed in the Southern District of New York. Marko R. Zoretic and Jack Hendershott, *"Schedule A" Cases: A Powerful Tool for Enforcing Design Patents*, N.Y.L.J. (May 15, 2023), https://www.law.com/newyorklawjournal/2023/05/15/schedule-a-cases-a-powerful-tool-for-enforcing-design-patents/.

issued against them is when they observe that their account and funds are frozen.[9] *Id.* at 191. Many defendants then rapidly settle in order to have their accounts unfrozen—whatever the legal merits of the claims—because it is "cheaper, quicker, or more predictable compared to fighting back." *Id.* at 192.

After these settlements, the plaintiff then usually seeks default judgments against defendants who have not appeared in the case, typically relying on the same or similar generic assertions as the TRO requests, which courts also tend routinely to grant. *Id.* at 192. The default judgments entered in this case amounted to $900,000 *per* defendant. Appx664. Three were against defendants who were alleged to be selling the same type of hanger ("Type 3") that had been found likely to be non-infringing by the district court a month before the default judgments were granted. Appx623 (alleging that three defaulting defendants sold Type 3 products); Appx433-34 (categorizing Appellee's accused product as Type 3).

For plaintiffs, the Schedule A model is not just a cost-effective mechanism to seek to enforce their intellectual property rights but also a potentially *lucrative* one— allowing plaintiffs to obtain procedurally flawed and legally deficient settlements

---

[9] Notice is essential. *See ABC Corp. I*, 51 F.4th at 1375-76. But just as in this case, Schedule A defendants almost never get notice before a TRO, and often get actual notice only shortly before a preliminary injunction. *See* Appx597-98; *see also*, Preliminary Injunction Ord. at 1-2, *The Pinkfong Co. Inc. v. 7 Day Store*, No. 1:22-cv-04133(S.D.N.Y. 2023), ECF No. 8.

and default judgments that may far exceed any damages the plaintiffs actually suffered. But Schedule A litigation abuses also harm parties beyond those directly involved. For example, they harm consumers by restraining legitimate competition in online marketplaces, which usually freeze both allegedly infringing *and* unchallenged non-infringing items upon receipt of the TRO. Goldman, *SAD Scheme* at 191. And, as in this case, these lawsuits sometimes remove from the market challenged products that are not infringing at all. Finally, improper mass-joinder has deprived the federal government of hundreds of millions of dollars in court filing fees for suits that, under the Rules of Civil Procedure, should have been brought separately. *Id.* at 185.

Appellants' lawsuit presents many of the procedural abuses found in the typical Schedule A cases. First, Appellants joined 67 defendants—who, as Appellants admit, sold at least four different kinds of products—in a single complaint, in violation of the special joinder requirements under the Patent Act. *See* 35 U.S.C. § 299(a)(1); Appx585 (admitting "defendants' products fall . . . into four groups."). Second, the complaint here was filed under seal and consisted primarily of generic, vague, and non-particularized allegations of infringement and harm. Third, Appellants were then granted an ex parte TRO that resulted in the freezing of over $40,000 in Appellee's merchant account, all while the case was still under seal and before any notice or chance for Appellee to contest Appellants' allegations.

Appx653-56. And the TRO was granted without the district court conducting the sort of particularized examination of any allegations of infringement specific to this Appellee (as distinct from the other 66 defendants) that it finally conducted when the case reached the preliminary injunction stage. Appx653-55; Appx554-57; Appx1-21.

## B. Appellants' Inability to Make the Necessary Showings for a Preliminary Injunction Is the Predictable Consequence of Their Failure to Plead Sufficiently.

Appellants' claims, like those in many other Schedule A cases, were legally and factually defective from the start. Here, Appellants' inability to show likelihood of infringement and/or irreparable harm at the preliminary injunction stage followed directly from earlier deficits and defects in their complaint, which did not comport with Rule 8's pleading requirements. *See* Fed. R. Civ. P. 8(a).

This Court has held that, while a patentee is "not required to plead infringement on an element-by-element basis," the patentee "must do more than merely allege entitlement to relief; it must support the grounds for that entitlement with *sufficient factual content.*" *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1352 (Fed. Cir. 2021) (emphasis added). Because a patentee's complaint must provide fair notice of what activities by the defendant(s) constitute infringement it should, at a bare minimum, state (1) which products are infringing and (2) how they infringe. Broad-brush allegations—like those in the complaint in this case and in

most other Schedule A patent infringement complaints—that a large group of (often-differentiated) defendants have advertised/offered for sale/sold/used (often different) goods infringing on a plaintiffs' patent generally do not establish the plausibility of liability required under this Court's applications of the Rule 8 pleading standard. *See* Fed. R. Civ. P. 8.

Schedule A cases are brought at large scale with many defendants—but courts assessing infringement claims where the accused products differ from each other in more than insignificant ways must undertake particularized examinations for each different product. *See ABC Corp. I v. P'ship & Unincorporated Ass'ns Identified on Schedule "A"*, 52 F.4th 934, 945 (Fed. Cir. 2022) (reversing the district court's grant of a preliminary injunction because it "improperly failed to undertake a product-by-product analysis."). For courts to be able to do so, Schedule A plaintiffs must—as required by Rule 8—provide sufficient factual allegations and legal arguments specific to each defendant and its product(s), not generic, bulk arguments about defendants as a group. *See* Fed. R. Civ. P. 8. Additionally, without particularized allegations, a defendant that manufactures and sells a variety of products may have no way of knowing which of its products are accused. If the specific accused products are not identified in the complaint, the defendants would have no way of knowing whether the plaintiff's asserted claim is plausible or be able to contest the plaintiff's allegations.

But even when Schedule A plaintiffs fail to plead sufficiently, district courts often accept those deficient and unsupported claims or, less often, conduct a rushed and cursory analysis. *See*, *e.g.*, Minute Entry at 1, *Atari Interactive, Inc. v. Individuals, Corps., Ltd. Liab. Cos., P'ships, & Unincorporated Ass'ns Identified on Schedule A to the Complaint*, No. 1:23-cv-15724 (N.D. Ill. Dec. 1, 2023), ECF No. 21 (considering the court's interest in "promoting judicial economy" and noting that Schedule A cases require courts to "quickly and efficiently evaluate hundreds of pages of evidentiary submissions to ensure that injunctive relief is warranted."). As a result, in many Schedule A scheme cases, plaintiffs routinely obtain uncontested TROs—the "linchpin" to the Schedule A model—even when their claims are factually and legally defective. *See* Goldman, *SAD Scheme* at 200-01. Schedule A litigation risks subjecting some defendants to a TRO and asset freeze even when, as in this case, there is no actual likelihood of infringement. *See*, *e.g.*, Ord. at 2, *Thousand Oaks Barrel Co.*, *LLC, v. P'ships & Unincorporated Ass'ns Identified on Schedule A*, No. 1:23-cv-03378 (N.D. Ill. 2023), ECF No. 45 (denying plaintiff's motion for preliminary injunction after the plaintiff had been granted a TRO and criticizing the design patent infringement argument advanced by plaintiff's counsel).

## C. Patent Cases Are Particularly Ill-Suited for Schedule A Litigation.

While the great majority of early Schedule A cases involved claims of trademark infringement, recent Schedule A litigation increasingly raises patent

claims. *See* Riddhi Setty & Isaiah Poritz, *Brands Flock to Chicago Court in War on Internet Counterfeiters*, BLOOMBERG L. (Apr. 5, 2023).[10] For example, between January, 2023 and June, 2024, 232 Schedule A design patent cases were filed in the Northern District of Illinois, constituting well over 50% of all patent cases filed in that district. *See Schedule A Cases Continue to Rise in the Northern District of Illinois*, LEX MACHINA (Jul. 24, 2024).[11] But the Schedule A litigation model is especially problematic in patent cases, which (1) are ill-suited to ex parte analysis, especially at scale, and (2) have special joinder requirements.

First, effectively examining the sufficiency of claims of patent infringement for numerous defendants (and potentially multiple products, where the plaintiffs ignore 35 U.S.C. § 299), on an extremely short time frame and ex parte, as should happen in Schedule A cases, is unworkable. For design patent cases, assessing visual similarity between accused and claimed designs necessitates detailed visual analyses. Utility patent cases usually require a claim-by-claim infringement analysis, making it crucial that plaintiffs provide organized exhibits that map features of the accused product(s) to a specific patent claim, as well as expert declarations analyzing

_____

[10] https://www.bloomberglaw.com/bloomberglawnews/ip-law/X1N9TA94000000?bna_news_filter=ip-law#jcite.

[11] https://www.lexisnexis.com/community/insights/legal/lex-machina/b/lex-machina/posts/schedule-a-cases-continue-to-rise-in-the-northern-district-of-illinois?srsltid=AfmBOop8RcjruJmeQvSFV3s1LeWvIPoQkB3QAZHIeiHHos27O10hDnof.

such features and claims. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("[A]t the preliminary injunction stage or at some later stage in the course of a particular case, infringement and validity analyses must be performed on a claim-by-claim basis.").

The mass-defendant Schedule A model simply does not lend itself to such careful, particularized analysis. As one district court recently noted, "the exhibits in Schedule A cases are frequently disorganized and poorly labeled, and plaintiffs rarely support any of their arguments with a defendant-specific analysis." *Zaful (Hong Kong) Ltd., v. Individuals, Corps., Ltd. Liab. Cos., P'ships, & Unincorporated Ass'ns Identified on Schedule A*, No. 1:24-cv-11111, 2025 WL 71797, at *6 (N.D. Ill. Jan. 10, 2025). Additionally, in design patent cases where the claimed and accused designs are not plainly dissimilar, step two of the *Egyptian Goddess* test "requires an informed and motivated defendant" to identify the prior art. Sarah Burstein, *Against the Design-Seizure Bill*, Patently-O (Jan. 3, 2020), https://patentlyo.com/patent/2020/01/against-design-seizure.html.

Second, the plaintiffs in many Schedule A patent cases—including this one—frequently disregard the special requirements of the Patent Act, which limit joinder to claims based on "*the same accused product*." 35 U.S.C. § 299(a)(1) (emphasis added). Importantly, "accused infringers may not be joined in one action as defendants . . . based solely on allegations that they each have infringed the patent

or patents in suit." 35 U.S.C. § 299(b). In this case, Appellants acknowledge that there are at least four different "types" of accused products sold by the 67 different defendants, in violation of the Patent Act's special joinder requirement. *See* Appx220-22; Appx585.

Improper joinder was not challenged in this case, and it is structurally unlikely to be challenged in most Schedule A cases because the very design of the litigation model depends on voluntary dismissals and default judgments. Defendants rarely end up with an opportunity to make substantive or procedural arguments. And while district judges occasionally raise the joinder issue on their own, *see e.g.*, Memorandum Op. at 2-4, *Zhaoshi Tang v. P'ships & Unincorporated Ass'ns Identified on Schedule A*, No. 1:23-cv-04587 (N.D. Ill. Jan. 4, 2024), ECF No. 88 (finding that the same product image and descriptions among defendants' webpages were insufficient to establish the "same accused product" joinder requirement in a design patent case), as this case shows, they do not always do so.

Adding to the reasons that the Schedule A litigation model is especially problematic in patent cases, plaintiffs often conflate the tort of patent infringement with the much more serious offense of counterfeiting. *See* Sarah Fackrell, *The Counterfeit Sham*, 138 HARV. L. REV. 471, 495-500 (2024). For example, Appellants here—despite bringing no trademark claims—refer to "foreign counterfeiting" and describe Appellee as a "foreign counterfeiting compan[y]" in this appeal.

Appellants' Br. at 24-25; *see also* Appx55 (complaint mentioning "counterfeit"); Appx94-95, 107-08 (counterfeit rhetoric and attached counterfeit reports/articles in declaration in support of TRO and preliminary injunction); Appx639-40 (conflating harm from infringement with harm from counterfeiting in a declaration in support of reconsideration and default judgment). But patent infringement is not counterfeiting. Such rhetoric is false and inflammatory fearmongering.

## CONCLUSION

This case is a typical example of the Schedule A model. A single complaint was brought against numerous defendants whose identities were kept under seal; an ex parte and sealed TRO was sought and granted with no careful examination of the sufficiency of the generic and non-specific factual allegations and nexus between the alleged infringement and alleged harm; and Appellee's online merchant account and assets were frozen in an amount 80 times that of the claimed infringement— even though the district court subsequently found there was no likelihood of infringement or irreparable harm.

For the reasons set forth above, *amici* agree with the district court's conclusions on likelihood of infringement and irreparable harm. But they also believe it is important for this Court to take account of the broader context of the many procedural and legal deficiencies in how this case, like most other Schedule A cases, was litigated, how those litigation abuses are particularly egregious in patent

cases, and how they can harm litigants, competition, and consumers.

Schedule A cases are rarely appealed (to *amici*'s knowledge, this case appears to be only the third Schedule A appeal before this Court) because the model puts defendants at such an extreme disadvantage: most defendants will be forced to settle quickly, be voluntarily dismissed, or will default—irrespective of whether the claims against them are meritorious. *See* Goldman*, SAD Scheme* at 201. Thus, this case presents a rare opportunity for this Court, in the course of evaluating the litigation and decision below, to address the abuses of the Schedule A litigation model in patent cases and to provide guidance to district courts handling such cases.

February 6, 2025

Respectfully submitted,

By: /s/ Phillip R. Malone

Phillip R. Malone
Juelsgaard Intellectual Property
   and Innovation Clinic
Mills Legal Clinic at Stanford
   Law School
559 Nathan Abbott Way
Stanford, CA 94305
Tel: (650) 725-6369
pmalone@stanford.edu

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2025, I caused the foregoing BRIEF OF
LAW PROFESSORS SARAH FACKRELL, ERIC GOLDMAN, ELIZABETH
ROSENBLATT, AND ERIC GOLDMAN AS *AMICI CURIAE* IN SUPPORT OF
DEFENDANT-APPELLEE AND AFFIRMANCE to be served by electronic
means via the Court's CM/ECF system on all counsel registered to receive
electronic notices.

February 28, 2025 /s/ Phillip R. Malone

Phillip R. Malone
JUELSGAARD INTELLECTUAL PROPERTY
  AND INNOVATION CLINIC
MILLS LEGAL CLINIC AT STANFORD
  LAW SCHOOL
559 Nathan Abbott Way
Stanford, CA 94305
(650) 725-6369
pmalone@stanford.edu

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE WITH
# TYPE-VOLUME LIMITATIONS

I hereby certify as follows:

1.      The foregoing BRIEF OF LAW PROFESSORS SARAH FACKRELL, ERIC GOLDMAN, ELIZABETH ROSENBLATT, AND ERIC GOLDMAN AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE complies with the type-volume limitation of Fed. Cir. R. 29(b) as specified in paragraph 6 of this Court's June 30, 2023 order. The brief is printed in proportionally spaced 14-point type, and the brief has 4,898 words according to the word count of the word-processing system used to prepare the brief (excluding the parts exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)).

2.      The brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac in 14-point Times New Roman font.

February 28, 2025

/s/ Phillip R. Malone
Phillip R. Malone
JUELSGAARD INTELLECTUAL PROPERTY
   AND INNOVATION CLINIC
MILLS LEGAL CLINIC AT STANFORD
LAW SCHOOL
559 Nathan Abbott Way
Stanford, CA 94305
(650) 725-6369
pmalone@stanford.edu
*Counsel for Amici Curiae*